**Not for Publication**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

NOHASSES G. C.,

                **Petitioner,**

        **v.**

THOMAS DECKER, *et al.*,

             **Respondents.**

**Civil Action No. 20-4653 (ES)**

**OPINION**

**SALAS, DISTRICT JUDGE**

Before the Court is petitioner Nohasses G. C.'s[1] ("Petitioner") amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, asking the Court to issue an Order requiring respondents Thomas Decker, Chad Wolf, William P. Barr, and Warden William Anderson ("Respondents") to immediately release Petitioner from immigration detention due to the ongoing COVID-19 pandemic.   (D.E. No. 36 ("Petition" or "Pet.")).   Also before the Court is Petitioner's emergent motion for an order to show cause with temporary restraints, which seeks the same relief. (D.E. No. 37 ("Motion")).   The Court has reviewed the parties' submissions and decides this matter without oral argument.   *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b).   For the reasons that follow, the Petition and the Motion are DENIED.

## I.    Background

### A.    Petitioner's Immigration and Criminal History

Petitioner is a 42-year-old native and citizen of the Dominican Republic, currently detained

---

[1]    This Opinion identifies Petitioner by his first name and the first initials of his surname in light of certain privacy concerns associated with § 2241 immigration cases.   This manner of identification comports with the Judicial Conference of the United States' Committee on Court Administration and Case Management's recommendations.

by U.S. Immigration and Customs Enforcement ("ICE") at Essex County Correctional Facility ("ECCF").   (Pet. ¶¶ 1 & 3).   On or about July 24, 1982, Petitioner was admitted to the United States as a lawful permanent resident.   (D.E. No. 41-9).   Since arriving in the United States, Petitioner has been convicted of several criminal offenses, including: (i) a March 19, 2002, conviction for criminal possession of a controlled substance in violation of New York Penal Law ("NYPL") Section 220.16(12); (ii) a February 8, 2006, conviction for criminal trespass in the second degree in violation of NYPL Section 140/15; (iii) a January 23, 2008, conviction for criminal possession of stolen property in the fifth degree in violation of NYPL Section 165.40; (iv) a March 30, 2010, conviction for driving while ability impaired by the consumption of alcohol in violation of Vehicle Traffic Law Section 1192(01); (v) a December 3, 2012, conviction for criminal possession of a controlled substance in the seventh degree in violation of Section NYPL 220.03; and (vi) a December 12, 2015, conviction for criminal sale of a controlled substance in the third degree in violation of NYPL Section 220.39(01).   (*See* D.E. No. 41-10).   More recently, on September 29, 2019, Petitioner was arrested for criminal possession of controlled substance in violation of NYPL Section 220.25, and for criminal possession of controlled substance in the third degree with intent to sell in violation of NYPL Section 220.16(02).   (*Id.*).   Those charges appear to be pending.   (*See id.*; D.E. No. 41-12).

On February 24, 2003, Petitioner was granted cancellation of removal by an immigration judge under Section 240A of the Immigration and Nationality Act ("INA").   (D.E. No. 41-11). On December 12, 2019, Petitioner was arrested by ICE New York Fugitive Operations and taken into ICE custody.   (*Id.*).   That same day, Petitioner was served with a Notice to Appear charging him with removability under Section 237(a)(2)(A)(iii) of the INA for having been convicted of an aggravated felony as defined in Section 101(a)(43)(B) of the INA for an offense relating to illicit

trafficking of a controlled substance.   (D.E. No. 41-9).   Petitioner was also charged with removability pursuant to Section 237(a)(2)(B)(i) of the INA, since after admission Petitioner was convicted of a violation of any law or regulation of a State, the United States, or a foreign country relating to a controlled substance.   (*Id.*).   ICE also rendered a custody determination for Petitioner, indicating that it was detaining him pursuant to 8 U.S.C. § 1226(c).   (*See* D.E. No. 41-13).   In response, Petitioner filed a Form I-589, application for asylum, withholding of removal and protection under the Convention Against Torture, which remains pending.   (Pet ¶ 1).

### B.   Petitioner's Alleged Underlying Medical Conditions

Petitioner alleges that in May of 2018 he "underwent serious surgery on his spine to treat a fusion and Cervicalgia," and that he "continues to suffer from neck and back pain."   (*Id.* ¶ 8). He asserts that as a result he has been rendered largely sedentary, "compromise[ing] his ability to socially distance."   (*See id.* ¶¶ 8 & 39).

Petitioner also alleges that his "medical records indicate that he is 5'8, 220 pounds," and that pursuant to the Centers for Disease Control and Prevention's ("CDC") body mass index chart, his "BMI is in excess of 33.44, which easily classifies as obese."   (*Id.* ¶ 39).   Notably, the only medical records Petitioner provides are records dated between 2017 and 2018, all of which pertain to his neck and back pain, herniated disk surgery, and related follow-ups.   (D.E. No. 36-1).   Thus, to support his alleged current weight and BMI, Petitioner cites to a medical record dated December 14, 2017, which reflects that at that time Petitioner had a BMI of 33.34.   (D.E. No. 42 at 4–5 (citing D.E. No. 36-1 at 2 (CM/ECF Pagination)).   On the other hand, Petitioner's Form I-213 indicates that as of December 12, 2019, Petitioner weighed 150 pounds.   (D.E. No. 41-12).

### C.   Procedural History

On March 30, 2020, Petitioner and several other detainees filed a joint petition for a writ

of habeas corpus pursuant to 28 U.S.C. § 2241 in the Southern District of New York ("SDNY") (D.E. No. 5), and subsequently filed a motion for a temporary restraining order (D.E. No. 6).   On April 3, 2020, respondents in that matter moved to sever and transfer several of the petitions (including Petitioner's) to the District of New Jersey.   (D.E. No. 13).   On April 14, 2020, the SDNY Court transferred those petitions to this District (D.E. No. 28), where the petitions were subsequently severed into individual cases pursuant to Standing Order 2020-10 (D.E. No. 32). After Petitioner's case was assigned to the Undersigned, the Court ordered Petitioner to file an amended petition consistent with the law of this Circuit.   (D.E. No 33).   On April 27, 2020, Petitioner filed the instant Amended Petition and Motion.   (Pet. & D.E. No. 37).   Petitioner seeks immediate release, asserting that his Fifth Amendment due process rights are being violated.   (*See generally* Pet; Motion at 15–16[2]).   Petitioner asserts two theories: (i) that Respondents' decision to continue to detain Petitioner despite knowledge of his health ailments and the resulting increased health risks should he contract COVID-19 amounts to deliberate indifference (Pet. at 20; Motion at 8–11); and (ii) that "that the conditions of confinement at the [ECCF] are tantamount to punishment and therefore unconstitutional" (Pet. ¶¶ 6 & 31; Motion at 5–8).

On April 28, 2020, the Court issued an Order outlining how Petitioner's Motion did not comply with Local Civil Rule 65.1, but allowed Petitioner to correct the deficiency.   (D.E. No. 38).   In response, counsel for Petitioner submitted an affidavit (D.E. No. 39) that, as the Court outlines below, falls woefully short of the Court's clear instructions and the requirements of Rule 65.1 (*see infra* Part III.A).   Thereafter, Respondents filed an opposition to both the Petition and Motion (D.E. No. 41), and Petitioner replied (D.E. No. 42).

---

[2]        Because Petitioner's moving brief does not include pagination, all page pincites to Petitioner's moving brief refer to the automatically generated CM/ECF pagination in the upper-righthand corner.

**D.     Conditions at ECCF**

**i.     Respondents' Evidence**

Respondents have provided a detailed overview, with supporting affidavits and evidence, of the measures taken by ICE and officials at ECCF to address and limit the spread of COVID-19 within the facility.   (*See* D.E. Nos. 41-2–41-7).   Particularly, with respect to the measures taken at ECCF, Respondents provide the declarations of Alfaro Ortiz, the Director of ECCF, as well as the declaration of Dr. Lionel Anicette, the Medical Director at ECCF.   (*See* D.E. Nos. 41-5–41-7).   The record shows that starting on or about the first week of March, Respondents began taking steps to address the spread of COVID-19 in ECCF, including: educating ICE detainees[3] on the importance of hand washing and best practices to prevent the spread of COVID-19; increasing monitoring of all detainees for symptoms or signs of illness; establishing and cleared a designated quarantine area; working with ECCF food vendors to establish new protocols; providing meals to detainees within their pods; hiring additional staff to provide additional cleaning and sanitizing of the facility; and implementing all CDC recommended cleaning and disinfection protocols beyond normal activity.   (D.E. No. 41-5 ¶ 15).   As the situation continues to develop, ECCF has continued to establish additional precautionary measures, including: regular calls amongst county wardens; disallowing family and friend visitations; relaying email messages from attorneys directly to their clients to set up phone conferences by the Inmate/Detainee Advocate; and modifying recreational groups.   (*Id.* ¶ 16).

For instance, additional Essex County medical staff are now on-site 24 hours a day, seven days a week to provide full coverage for all detainee and inmate medical needs.   (D.E. No. 41-5

---

[3]     The measures described in this section apply to all inmates and ICE detainees at ECCF.   (*See generally* D.E. Nos. 41-5 & 41-6).   However, for purposes of this Opinion the Court will only refer to "detainees".

¶ 9).   Medical personnel at ECCF consist of medical doctors, registered nurses ("RNs"), licensed practical nurses ("LPNs"), nurse practitioners, and physician assistants.   (*Id.* ¶ 10).   There are always two RNs and LPNs in the building.   (*Id.*).   There is also a nurse practitioner in the facility 24 hours a day, seven days a week.   *Id.*   A physician is at the facility 16 hours a day, seven days a week, while a physician is on-call on a 24-hour basis for any emergency needs.   (*Id.*).   Since early February 2020, ECCF correctional and medical staff, in conjunction with the New Jersey Department of Health, CDC, and other public health and correctional institutions, have been tracking the outbreak, regularly updating infection prevention and control protocols, and issuing guidance to staff on screening and management of potential exposure among detainees. (*Id.* ¶ 11).

ECCF has also implemented new hygiene protocols.   For example, detainees now have unlimited access to soap and water.   (*Id.* ¶¶ 23–24).   As of May 1, 2020, ECCF had an eleven-month supply of soap, with almost 200,000 bars of soap and thousands of units of personal protective equipment ("PPE") like surgical and N95 masks, sanitizer, gloves, and protective body suits.   (*Id.* ¶ 24; D.E. No. 41-6 ¶ 13).   Additionally, common spaces and equipment are sanitized regularly, and the telephones and tablets available for detainee use are cleaned between uses. (D.E. No. 41-6 ¶ 14).   Toilets are similarly cleaned between uses.   (*Id.*).   Cleaning is done by designated cleaners, who are provided with gloves and masks.   (*Id.*).   Moreover, detainees also have access to disinfecting spray upon request (D.E. No. 41-5 ¶ 23 ("Since the cleaning solution contains bleach, the correctional officers have to control it because it presents a safety hazard if the solution is sprayed in a person's eyes.")), and cleaning agents are available in the showers for detainees to clean those areas themselves between uses (D.E. No. 41-6 ¶ 14).

Similarly, ECCF has implemented new strategies to reduce the spread of COVID-19 and protect those who are more vulnerable.   ECCF is currently operating at less than 75 percent

capacity: while the facility has a max capacity of 2368 inmates and detainees, as of May 3, 2020, ECCF's total population was just 1,635.   (D.E. No. 41-5 ¶ 4).   Additionally, the buildings where detainees are housed are divided into pods, within which there is enough space for detainees to practice the recommended social distancing of at least six feet.   (*Id.* ¶ 5–6).   Moreover, all staff members are provided with surgical masks and gloves when they report to work and must wear masks while at ECCF.   (D.E. No. 45-6 ¶ 9).

Moreover, ECCF conducts a health check on all detainees that enter the facility and has conducted medical reviews for each of its detainees, separating them depending on their medical condition.   (*See id.* ¶¶ 8 & 15r.; D.E. No. 45-6 ¶ 18).   For instance, individuals with health conditions identified by the CDC as putting them at a high risk of developing serious illness or death from COVID-19 are housed separately.   (D.E. No. 41-6 ¶ 18; D.E. No. 41-5 ¶ 33).   Correctional officers who work with those high-risk detainees use full PPE including Tyvek suits, N95 masks, and gloves.   (D.E. No. 41-5 ¶ 33).

In terms of testing for COVID-19, ECCF follows CDC guidance by having medical staff immediately evaluate detainees who complain of illness.   (D.E. No. 41-5 ¶ 17).   A nurse visits every housing unit twice daily, at which time detainees may report any health problems.   (*Id.*; D.E. No. 41-6 ¶ 5).   Detainees can also place requests via tablets made available for their use. (*See* D.E. No. 41-5 ¶ 17; D.E. No. 41-6 ¶ 14).   If a detainee or inmate reports experiencing COVID-19 symptoms to a staff member outside the daily nurse rounds, then the staff member can call the nurse's office for an immediate triage assessment depending on the apparent severity of the symptoms.   (D.E. No. 41-6 ¶ 5).   The nurse then decides whether the detainee or inmate should be evaluated immediately or whether the person can wait to be assessed during one of the twice-daily nurse rounds.   (*Id.*).   If an inmate or detainee exhibits signs or symptoms of COVID-

19, including respiratory illness, they are provided with surgical masks.   (D.E. No. 41-5 ¶ 17; D.E. No. 41-6 ¶ 10).

Those detainees who are symptomatic but have not yet been tested, are evaluated by medical severity and started on anti-viral medications.   (D.E. No. 41-5 ¶ 19).   Vitals, including temperatures, are monitored daily, and detainees are evaluated for hospital placement.   (*Id.*). ECCF does not perform diagnostic molecular testing inhouse, but rather uses University Hospital to conduct testing.   (D.E. No. 41-5 ¶ 18; *see also* D.E. No. 41-7 ¶ 7 (explaining reasons why it is not feasible for ECCF to conduct swab testing in-house)).   ECCF immediately transports moderate to severely symptomatic detainees to University Hospital for a medical evaluation. (D.E. No. 41-5 ¶ 18; D.E. No. 41-7 ¶ 6).   On the other hand, pursuant to the hospital's policy, mildly symptomatic detainees are transferred to the quarantine unit within ECCF, where they are clinically assessed and treated as presumptively positive for COVID-19.   (D.E. No. 41-5 ¶ 18; D.E. No. 41-6 ¶ 6; D.E. No. 41-7 ¶ 6).   Finally, detainees who test positive for COVID-19 but do not require hospitalization are returned to ECCF, where they are quarantined.   (D.E. No. 41-5 ¶ 18).   Detainees who are placed in quarantine are housed separately in what would otherwise be a two-person cell, ensuring social distancing.   (D.E. No. 41-5 ¶ 20 ("Because this unit is operating under capacity, there is space for the detainees to practice social distancing.")).   These single occupancy cells have closed walls and a food port with a flap through which food can be passed in and out.   (D.E. No. 41-6 ¶ 2).   Quarantined individuals remain isolated for 14 days.   (D.E. No. 41-5 ¶ 19).

Similarly, ECCF has also implemented cohorting, pursuant to which detainees who have had known exposure to a confirmed case of COVID-19, but are asymptomatic, are housed together. (*Id.* ¶ 21).   Cohorted detainees remain in that unit for a period of 14 days, and cohorting terminates

if no new COVID-19 case develops in that time.   (*Id.*).   This unit is operating under capacity, allowing ample room for social distancing for any detainees who must be cohorted.   (*Id.*).

More recently, ECCF began conducting COVID-19 rapid antibody testing on its entire population, with the consent of each individual, as part of its containment and quarantine strategy. (*Id.* ¶ 32; D.E. No. 41-6 ¶ 17; *see also* D.E. No. 41-7 ¶¶ 8–19 (Dr. Lionel Anicette describing the rapid antibody testing measures)).   Particularly, ECCF is using the results of rapid testing as an additional screening tool to help officials determine how to separate detainees in order to prevent the spread of COVID-19; ECCF is not using the results to diagnose COVID-19.   (*See* D.E. No. 41-5 ¶ 32; D.E. No. 41-7 ¶¶ 10–11).   For instance, if a detainee in a housing unit shows symptoms of COVID-19 or tests positive for COVID-19, ECCF performs antibody testing on all other detainees who were housed with that individual.   (D.E. No. 45-6 ¶ 17).   Detainees who test negative for COVID-19 antibodies are deemed "at risk for exposure" and are housed with other individuals who received the same result pursuant to the cohorting protocol in a unit that allows for social distancing.   (D.E. No. 45-7 ¶¶ 17 & 19).   This is because negative rapid test results "do not rule out COVID-19 infection."   (*Id.* ¶ 17).   Detainees whose rapid tests suggest that they may be experiencing early exposure to COVID-19 or an acute COVID-19 infection, whether they are symptomatic or not, are placed in quarantine for 14 days.   (*Id.* ¶¶ 14–15 & 19).   And at the end of the 14-day period individuals who are symptomatic remain in quarantine, while individuals who are asymptomatic are tested again and their quarantine is terminated or extended depending on the results.   (*Id.* ¶¶ 14–15).   Asymptomatic detainees whose rapid test results suggest that they may have developed immunity to COVID-19 are presumed recovered will be re-integrated into the general population.   (*Id.* ¶¶ 16 & 19).

Respondents report that as of May 4, 2020, at 9:00 a.m., ECCF has identified the following

confirmed cases of COVID-19 among inmates, detainees, and staff: three ICE detainees; five county inmates in Delaney Hall[4] who are "in COVID Housing" and five county inmates who have recovered; eighty-three members of the ECCF correctional staff, forty-nine of whom have been cleared and returned to work; and three members of the civilian staff who are not currently working at ECCF.   (D.E. No. 41-5 ¶ 31).   "All staff who were in proximity of those testing positive have been sent home to self-quarantine for the recommended 14-day time period or are in the hospital for further treatment."   (*Id.*)

ii.     **Petitioner's Evidence**

Petitioner's Amended Petition generally asserts, in conclusory fashion, that social distancing and vigilant hygiene is not possible in ECCF, because there is "a lack of soap, the telephone units used by all detainees to call their families are not regularly sanitized, the dormitory spaces are shared by dozens and also used to eat meals, and laundry is currently unavailable in at least one ICE detainee dormitory."   (Pet ¶ 37).   The Petition and Motion provide no evidence to support any of these assertions.

In his Reply, Petitioner attached for the first time two affidavits prepared by former ECCF detainees:   one by Charles McCarthy, dated April 24, 2020 (D.E. No. 42-2), and the other by Rickey Roberts, dated May 7, 2020 (D.E. No. 42-3).   Both affidavits generally describe the alleged conditions at ECCF between March and mid-April of 2020.   (*See generally* D.E. Nos. 42-2 & 42-3).   However, many of the allegations contained in these affidavits constitute impermissible conclusions of law or fact, or are simply vague unsubstantiated conjecture outside the personal knowledge of the affiant.   (*See, e.g.*, D.E. No. 42-2 ¶ 5 (assuming, without any basis,

---

[4]       "Delaney Hall is located across the street from the ECCF facility and is not part of the same building where ICE detainees are currently housed."   (D.E. No. 41-5 ¶ 31).

that it was "very dangerous" for ECCF officers to not disclose to the general inmate population the medical diagnosis of other detainees thought to be sick); *id.* ¶ 8 (concluding, without any factual explanation, that "we were not really given enough time" to keep clean); *id.* ¶ 9 (asserting, without providing any basis, that the "jail and the whole system were not built for" maintaining social distancing); *id.* ¶ 10 (asserting that while the toilet and water worked in his cell, he "know[s] other people had problems with that type of thing, and being locked in for so long without working facilities can be extremely difficult"); *id.* ¶¶ 5–9 (referring to "we," apparently to describe the collective experience of all detainees, not just affiant's own experience, without providing any explanation for the basis of that knowledge); D.E. No. 42-3 ¶ 3 (concluding that the setup of the dining area "causes a lot of crowding"); *id.* ¶ 8 (speculating that "people really started to get sick" during the second week of March because of "a newly admitted inmate," and asserting that this unnamed inmate was "showing symptoms such as fever," without providing any basis for how that information is within affiant's personal knowledge); *id.* ¶ 9 (asserting, without providing any basis, that he "know[s] inmate who had come down with fevers of 102, 104"); *id.* ¶¶ 15 (concluding that "it is impossible to 'socially distance' in a place like Essex"); *id.* ¶¶ 4–7, 10–12 & 15–16 (referring to "we," "us," and "our," apparently to describe the collective experience of all detainees, not just affiant's own experience, without providing any explanation for the basis of that knowledge). More importantly, neither affiant has personal knowledge of the *current* conditions at ECCF, since McCarthy was released on April 22, 2020 (D.E. No. 42-2 ¶ 12), while Roberts was released on April 27, 2020 (D.E. No. 42-3 ¶ 1).   Nor do these affidavits provide anything that would show that *Petitioner's* conditions of confinement *today* are not as described by the May 4, 2020, declarations of Mr. Ortiz.

Additionally, Petitioner's Reply includes a declaration of Dr. Jaime Meyer, dated April 21,

-11-

2020, which was apparently previously submitted in a different case.   (D.E. No. 42-1).   Dr. Meyer's declaration generally describes the limitations of the antibody testing (*see, e.g.*, *id.* ¶¶ 15–23), and concludes that ECCF is mistakenly relying solely on the results of the antibody tests to categorize people as COVID-19 positive, negative, or recovered from the virus and now immune and not contagious, and housing them accordingly (*see, e.g.*, *id.* ¶ 32).   But Dr. Meyer's declaration reached that conclusion based on her review of an ECCF April 13, 2020 Press Release, a document summarizing the results of tests performed by ECCF dated April 20, 2020, and a prior declaration of Mr. Ortiz dated April 20, 2020, that appeared to imply that rapid testing would replace swab testing.   (*See id.* ¶¶ 7, 29 & 31).   However, Dr. Meyer's declaration does not appear to be responsive to how ECCF is currently using rapid testing, as described by the declarations of Mr. Ortiz and Dr. Anicette.   In fact, the declarations of Mr. Ortiz and Dr. Anicette make abundantly clear that antibody testing *is not* being used "to diagnose COVID-19, to research if there is active COVID-19 infection, or to dictate empiric therapeutic treatment," (D.E. No. 41-7 ¶ 10), but rather, ECCF is using rapid testing as a "supplementary screening tool" that "is part of ECCF's containment and quarantine strategy."   (D.E. No. 41-5 ¶ 32; D.E. No. 41-7 ¶¶ 11–12 ("ECCF is using this tool as an additional measure to prevent the spread of COVID-19.")).

## II.   Jurisdiction

As a preliminary matter, the Court finds that it has jurisdiction over the instant Petition for a writ of habeas corpus challenging the Petitioner's conditions of confinement.[5]   Under 28 U.S.C. § 2241(c), habeas relief may be extended to a prisoner when he "is in custody in violation of the Constitution or laws or treaties of the United States."   28 U.S.C. § 2241(c)(3).   A federal court

---

[5]      A "challenge to a federal court's subject-matter jurisdiction may be made at any stage of the proceedings, *and the court should raise the question sua sponte*[.]"   *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004) (citing *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884)) (emphasis added).

has jurisdiction over such a petition if the petitioner is "in custody" and the custody is allegedly "in violation of the Constitution or laws or treaties of the United States."   28 U.S.C. § 2241(c)(3); *Maleng v. Cook*, 490 U.S. 488, 490 (1989).   Here, the Petitioner is currently detained in a locality within this Court's jurisdiction and by a custodian located within the Court's jurisdiction.   The Petition and application for a preliminary injunction and restraining order asserts that Petitioner's continued detention violates the Due Process Clause of the Fifth Amendment.   Thus, this Court has habeas jurisdiction.  *See Spencer v. Kemna*, 523 U.S. 1, 7 (1998); *Braden v. 30th Judicial Circuit Court*, 410 U.S. 484, 494–95, 500 (1973); *see also Zadvydas v. Davis*, 533 U.S. 678, 699 (2001).

That said, it is not lost on this Court that conditions of confinement claims, like the ones Petitioner asserts, are traditionally brought through a civil rights complaint pursuant to 42 U.S.C. § 1983.  *See e.g.*, *Camacho Lopez v. Lowe*, No. 20-0563, 2020 WL 1689874, at *4–6 (M.D. Pa. Apr. 7, 2020).   Conversely, challenges to "the fact or length of confinement" are properly brought in a habeas corpus petition.  *See Tedford v. Hepting*, 990 F.2d 745, 748 (3d Cir. 1993) (quoting *Preiser v. Rodriguez*, 411 U.S 475, 494 (1973)).   Here, Petitioner seeks immediate release from ICE custody, which is a remedy available through a habeas petition, not in a civil rights action. *See, e.g.*, *Preiser*, 411 U.S. at 494; *Leamer v. Fauver*, 288 F.3d 532, 540 (3d Cir. 2002).

There is currently no Third Circuit or Supreme Court decision that directly addresses whether a conditions of confinement claim may be raised in a habeas corpus petition.  *See Camacho*, 2020 WL 1689874, at *5; *see also Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 241–42 (3d Cir. 2005).   However, the Supreme Court has stated that "[w]hen a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal."  *Preiser*, 411 U.S. at 494; *see also*

-13-

*Ziglar v. Abbasi*, 137 S.Ct. 1843, 1862–63 (2017).   Similarly, the Third Circuit has alluded to the possibility of a "habeas attack on the conditions of confinement," which would be "cognizable in a federal habeas action *only in extreme cases*."   *Ali v. Gibson*, 572 F.2d 971, 975 n.8 (3d Cir. 1978) (emphasis added).   Moreover, recent caselaw within this circuit has been largely consistent in finding that an immigration detainee may challenge the conditions of his confinement through a Section 2241 petition.   *See e.g.*, *Carmen R. v. Decker*, No. 20-3875, 2020 WL 2029337, at *12 (D.N.J. Apr. 28, 2020) (collecting cases); *Thakker v. Doll*, No. 20-480, 2020 WL 2025384, at *2 (M.D. Pa. Apr. 27, 2020) (collecting cases).

In light of these considerations, the Court joins the line of cases that have permitted conditions of confinement claims to proceed through a habeas corpus petitions, and finds that Petitioner may pursue his due process claims through the present Petition.

## III.   Discussion

### A.   Procedural Deficiencies

As a starting point, the Court notes that the Petition is procedurally deficient.   An application for habeas relief under 28 U.S.C. § 2241 requires that the petitioner submit such application "in writing signed and verified by the person for whose relief it is intended or by someone acting in his behalf."   28 U.S.C. § 2242; Habeas Rule 2(c)(5) (requiring that the petition be "signed under penalty of perjury by the petitioner or by a person authorized to sign it for the petitioner"); *see also* L. Civ. R. 11.2 (requiring that "every petition shall be verified and, whenever possible, by the person on whose behalf it is presented," and that when verification is by another, "the affiant, declarant or certifier shall state in the affidavit, declaration, certification or other document submitted in accordance with 28 U.S.C. § 1746 the reasons such person does not make the verification and the affiant's, declarant's or certifier's authority for making it").   And when

-14-

someone other than the petitioner signs and verifies the petition, such person must "provide an adequate explanation—such as inaccessibility, mental incompetence, or other disability—why the real party in interest cannot appear on his own behalf to prosecute the action."   *See Whitmore v. Arkansas*, 495 U.S. 149, 163 (1990); *cf. Lucky v. Calderon*, 86 F.3d 923, 925 (9th Cir. 1996) (noting that a habeas petitioner's attorney could sign and verify the petition for the petitioner when counsel provided an affidavit explaining why petitioner was unable to do so).

Here, although the Petition is signed by Petitioner's counsel, it is not verified either by Petitioner or someone acting on his behalf.   (D.E. No. 36).   Further, nowhere does Petitioner's counsel provide an explanation as to why Petitioner cannot sign and verify the application.   Thus, the application does not comply with Section 2242 and is subject to dismissal.   *See, e.g.*, *Cox v. McBride*, 279 F.3d 492 (7th Cir. 2002); *Hendricks v. Vasquez*, 908 F.2d 490, 491 (9th Cir. 1990).

Similarly, Petitioner's Motion is equally procedurally deficient.   First, as the Court's prior Order noted, the verification requirement applies to emergent applications for injunctive relief. (*See* D.E. No. 38); L. Civ. R. 65.1(a).   And although Petitioner's counsel filed an affidavit (D.E. No. 39), it falls woefully short of the requirements set out by the local rules and the Court's explicit instructions.   For one, the affidavit is replete with improper arguments and conclusions of fact and law, as well as statements not within counsel's personal knowledge.   (*See, e.g.*, D.E. No. 39 ¶¶ 4–6); *see also* L. Civ. R. 7.2(a) (stating that "[a]ffidavits declarations, certifications and other documents of the type referenced in 28 U.S.C. §1746 shall be ***restricted to statements of fact within the personal knowledge of the signatory*** . . . . Argument of the facts and the law shall not be contained in such documents" and "***will be disregarded by the Court***") (emphasis added); *Falato v. Fotografixusa, L.L.C.*, No. 09-5232, 2013 WL 1846807, at *5 (D.N.J. Apr. 30, 2013) (disregarding argument and facts not within personal knowledge set out in attorney certification).

And more importantly, the affidavit simply fails to verify *any* of the allegations of facts asserted by the Petition that might give rise to the alleged emergency, as required by Rule 65.1; namely, Petitioner's conditions of confinement, health, and the like.   Thus, on this ground alone the Motion is subject to denial.   *See, e.g.*, *Diaz v. Muller*, No. 11-4029, 2011 U.S. Dist. LEXIS 78361 at \*2 (D.N.J. July 19, 2011) (denying emergency treatment of Section 2241 habeas petition because the motion was not supported by the required affidavit or verified complaint); *Bryant v. Nolan*, No. 09-2672, 2009 WL 2843902, at \*2 (D.N.J. Sept. 1, 2009) (noting that noncompliance with Rule 65.1(a) "preclude[s] granting emergency relief").

Moreover, Petitioner's Motion also fails to comply with the requirements of Local Civil Rules 7.1 and 7.2.   For instance, the Motion contains no separate Notice of Motion document. *See* L. Civ. R. 7.1(b)(2); *Ledgestone Assocs., LLC v. Internet Methods*, No. 06-0567, 2008 WL 2625353, at \*2 (D.N.J. June 27, 2008).   Additionally, both the moving and reply briefs fail to provide the required table of authorities and table of contents.   *See* L. Civ. R. 7.2(b).

The Court certainly understands the exigency presented by the ongoing COVID-19 pandemic, but that is not an excuse for sophisticated counsel to throw the rules of civil procedure out the window and ignore the Court's instructions.   Thus, while the Court proceeds to the merits of the Petition and will deny the Motion as moot, in the future counsel should be more careful to follow *all* applicable Court rules.

## B.   The Petition is Denied on its Merits

Turning to the merits of the Petition, it is undisputed that Petitioner has been lawfully detained pursuant to 8 U.S.C. § 1226(c).   Congress specifically defined certain categories of aliens for whom detention is mandatory.   *See* 8 U.S.C. § 1226(c)(1) (stating that "[t]he Attorney General shall take into custody any alien" who is inadmissible or deportable on the basis of enumerated

categories of crimes and terrorist activities).   In fact, the statue recognizes only one exception to mandatory detention—if the Attorney General decides that it is necessary for witness protection purposes—which is not applicable here.   *See* 8 U.S.C. § 1226(c)(2).   And the Supreme Court has held that aliens detained pursuant to Section 1226(c) are not entitled to release while their proceedings remain open, subject to this one exception.   *See Jennings v. Rodriguez*, 138 S. Ct. 830, 846 (2018); *Borbot v. Warden Hudson Cnty. Corr. Facility*, 906 F.3d 274, 277 (3d Cir. 2018) ("By its terms, § 1226(c) does not entitle detainees to a bond hearing.").

Nonetheless, Petitioner seeks release, alleging that his Fifth Amendment due process rights are being violated because "Petitioner will likely be infected with COVID-19 and be left without access to adequate treatment, leading to likely serious medical complications and possibly death." (Motion at 3).   As the Court outlines below, Petitioner's constitutional claims are unsubstantiated, and the Petition must be denied as a result.

### i.      Deliberate Indifference Claim

To establish a claim for deliberate indifference to medical care under the Due Process Clause, the Petitioner must show that (i) he has "a serious medical need"; and (ii) "acts or omissions by [ECCF] officials that indicate deliberate indifference to that need."   *See, e.g.*, *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003).   The Supreme Court has stated that deliberate indifference to a prisoner's medical needs exists only if "the official knows of and disregards an excessive risk to inmate health or safety."   *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).   This standard requires that the officials were "both [ ] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and . . . dr[e]w th[at] inference."   *Natale*, 318 F.3d at 582.   Where some treatment or proscriptive action designed to alleviate the medical need has been provided and the dispute is over the adequacy of the treatment

or preventative steps taken, "federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Everett v. Nort*, 547 F. App'x 117, 121 (3d Cir. 2013) (quoting *United States ex rel. Walker v. Fayette Cnty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)).   Neither a detainee's subjective dissatisfaction or disagreement with the professional judgment of medical staff as to how best to deal with a medical issue are normally sufficient to establish deliberate indifference. *Hairston v. Director Bureau of Prisons*, 563 F. App'x 893, 895 (3d Cir. 2014); *White v. Napolean*, 897 F.2d 103, 110 (3d Cir. 1990).

Here, Petitioner has failed to show a serious medical need.   Petitioner, who is 42-years-old, claims that he suffers from three types of physical ailments: (i) issues with his spine (i.e., surgery on a herniated disc in May 2018, intense pain in his spine, and fusion of the spine); (ii) sedentariness following his surgery, and (iii) obesity.   (Pet. ¶¶ 5 & 39).[6]   He asserts that his medical history places him at a higher risk of adverse health effects should he contract COVID-

---

[6]        The Petition also asserts that Petitioner "did struggle to breathe after surgery[ ] and is a regular smoker," and goes on to speculate that "[t]hough undiagnosed, Petitioner may suffer some type of respiratory illness.  (*Id.* ¶ 39). However, the medical records provided indicate that while he did go to the emergency room complaining of difficulty breathing three days after his surgery, Petitioner was successfully treated and released, and on May 31, 2018, he reported not having shortness of breath.  (D.E. No. 36-1 at 12–13 (CM/ECF Pagination)).  Thus, these allegations and evidence do not show a current respiratory ailment.  Similarly, Petitioner's claim that he "may suffer some type of respiratory illness" is not a diagnosed medical ailment and is far too vague and speculative to be taken as true.  *See McFarland v. Scott*, 512 U.S. 849, 856 (1994) ("Habeas corpus petitions must meet heightened pleading requirements."); *United States v. Thomas*, 221 F.3d 430, 437 (3d Cir. 2000) (noting that "vague and conclusory allegations contained in a [habeas] petition may be disposed of without further investigation by the District Court").

        Moreover, Petitioner does not actually allege that he currently has a diagnosed respiratory ailment or even that he has trouble breathing today.  (*See generally* Pet.).   The Court is aware that on April 30, 2020, Petitioner's counsel submitted an affidavit in support of the Motion, attempting to comply with Rule 65.1(a) and the Court's prior Order.  (D.E. No. 39).  There, counsel attested that "Petitioner has also reported trouble breathing, and has recently requested a symbicort inhaler, though that request was denied by the medical staff at ECCF."  (*Id.* ¶ 4).  But that allegation was not raised by the Petition, and counsel's affidavit cannot be used to amend the Petition.  *See* 28 U.S.C. § 2242 (allowing petitions to be amended "as provided in the rules of procedure applicable to civil actions"); Fed. R. Civ. P. 81(a)(4) (stating that the rules of civil procedure "apply to proceedings for habeas corpus"); *Hart v. Elec. Arts, Inc.*, 740 F. Supp. 2d 658, 663 (D.N.J. 2010) (noting that a plaintiff may not amend his complaint through a declaration or certification); *see also McArdle v. Tronetti*, 961 F.2d 1083, 1089 (3d Cir. 1992) ("[D]efects in [a] complaint clearly [can] not be remedied by [an] affidavit.").   More importantly, counsel provides no basis for how this alleged fact is within *his* personal knowledge.  *See* L. Civ. R. 7.2(a).   Accordingly, this allegation is not properly before the Court. To be sure, the analysis that follows would not change even if the Court were to consider this allegation.

19.  (*Id.* ¶ 39).  On this record, however, Petitioner's medical claims are either unsubstantiated or simply not recognized by the CDC as conditions that place him at risk of serious illness if he were to contract COVID-19.

  For instance, Petitioner only provides medical records dating from 2017 to 2018 regarding his herniated disc, subsequent surgery, and follow-ups.  (D.E. No. 36-1).  While these records substantiate that he had herniated disc surgery and complained of neck and back pain two years ago, there is absolutely no evidence to support his claimed ongoing pain, the related sedentariness, or its severity.  Moreover, while these records show that on December 14, 2017, Petitioner weighed 220 pounds and had a BMI of 33.34%, nothing demonstrates Petitioner's *current* weight or BMI.  To the contrary, Petitioner's Form I-213 indicates that as of December 12, 2019, Petitioner weighed 150 pounds (D.E. No. 41-12), which according to the CDC's BMI calculator, results in a "Normal" BMI of 22.8.[7]   In short, Petitioner's relies on nothing but vague, generalized, and unsupported alleged ailments, meriting denial of his due process claims on this ground alone. *See, e.g.*, *Jose D. M. v. William Barr*, No. 20-4031, 2020 WL 1969893, at *5–6 (D.N.J. Apr. 24, 2020) (finding same and collecting cases); *Emerson O. C.-S. v. William Anderson*, No. 20-3774, 2020 WL 1933992, at *6 n.5 (D.N.J. Apr. 22, 2020) (finding affidavit from attorney relaying petitioner's fears that he was exhibiting COVID-19 symptoms did not warrant release); *Jorge V. S. v. Green*, No. 20-3675, 2020 WL 1921936, at *3 n.2 (D.N.J. Apr. 21, 2020) (denying release and rejecting deliberate indifference claim based solely on Petitioner's conclusory statements regarding his illness); *Buleishvili v. Hoover*, No. 20-0607, 2020 WL 1911507, at *6 (M.D. Pa. Apr.

---

[7] Ctrs. for Disease Control and Prevention, *Adult BMI Calculator*, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator html (enter "5" in the box labeled "Feet"; then enter "8" in the box labeled "Inches"; then enter "150" in the box labeled "Pounds"; finally click "Calculate") (last visited May 13, 2020).

20, 2020) (finding that petitioner had "presented no evidence suggesting that his medical condition makes him uniquely susceptible to either contracting the virus or experiencing severe complications from the disease").

However, even if the Court were to take Petitioner's allegations as gospel, his age and alleged conditions do not qualify as CDC risk factors for COVID-19.  First, Petitioner does not fall within the at-risk age group identified by the CDC, since he is 42-year-old.  *See* Ctrs. for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html. (last visited May 13, 2020).  Additionally, issues with one's spine and associated sedentariness are not ailments that fall on the CDC's list of at-risk conditions.  *See id.*  And while *severe* obesity (defined as a BMI of 40 or above) is a CDC risk factor, *see id.*, Petitioner identifies his BMI as 33.34 (*see* Pet. ¶ 39).  Multiple courts have held that immediate release should be denied if the detainee does not meet a CDC risk category.  *See, e.g.*, *Daniel R.-S. v. Anderson*, No. 20-3175, 2020 WL 2301445, at *5 (D.N.J. May 8, 2020) (denying request for immediate release from ECCF, because "[p]etitioner has not alleged that he suffers from COVID-19, has not identified any pre-existing condition that would render COVID-19 an extreme threat to him specifically, and is not in the age category considered at high risk of serious complications from COVID-19"); *Emerson O. C.-S.*, 2020 WL 1933992 (dismissing claim where petitioner alleged "he was experiencing COVID-19 symptoms such as a cough"); *Jorge V. S.*, 2020 WL 1921936, at *1 & 3 n.2 (denying petitioner's deliberate indifference claim based on his allegedly ongoing illness where, in both his petition and reply brief, he "presented no evidence regarding [the p]etitioner's [latest] medical condition other than the affidavit from [the p]etitioner's friend regarding [the p]etitioner's status" and concluding that the petitioner failed to show that "he suffers from a continuing medical

condition requiring further treatment"); *Graham v. Decker*, No. 20-2423, 2020 WL 1847568, at *1–2 (S.D.N.Y. Apr. 13, 2020) (denying immediate release of petitioner who alleged to be suffering from stomach ulcers, osteoarthritis, a facial cyst, persistent depressive disorder, and post-traumatic stress disorder because these ailments were not among those listed by the CDC as presenting a heightened risk for COVID-19 complications).

Lastly, even if Petitioner had established a serious medical need, he cannot show that ECCF officials were deliberately indifferent to that need.  To do so, he must show that the facility recklessly disregarded his medical needs.  *Harvey v. Chertoff*, 263 F. App'x 188, 191 (3d Cir. 2008).   But given the extensive and ongoing measures that ECCF has enacted to stem the spread of COVID-19 (*see supra* Part I.D.i.), "jail officials are well aware of the risks and dangers posed by COVID-19 and have taken more than adequate steps to alleviate that risk to the best of their ability," *see Jorge V.S.*, 2020 WL 1921936, at *3 ("That these steps do not guarantee Petitioner will remain healthy and free of the disease is immaterial, the constitution requires no such perfection.").   Petitioner does not provide anything to show that the steps taken by ECCF are insufficient to meet his particularized medical needs.   And since Petitioner does not allege, much less provides any evidence supporting a finding, that ECCF officials have actually denied him any necessary medical treatment (*see generally* Pet.), he "cannot show that the jail has been deliberately indifferent to his needs in relation to the COVID-19 pandemic," *see Jorge V.S.*, 2020 WL 1921936, at *3 (denying deliberate indifference to medical need claim, as ECCF officials took "more than adequate steps to alleviate" the risks and dangers COVID-19 posed to the petitioner); *Daniel R.-S.*, 2020 WL 2301445, at *6 ("Based on ECCF's actions detailed above and Petitioner's inability to point to a particularized medical condition he suffers from that is not being addressed by ECCF, the Court cannot find that the jail has been deliberately indifferent to the danger that the

virus poses specifically to [p]etitioner.").

### ii.        Petitioner's Conditions of Confinement Claim

Petitioner's condition of confinement claim fairs no better.   Civil detainees like Petitioner who challenge the conditions of their confinement must show a violation of the Due Process Clause of the Fifth Amendment.   *See E.D. v. Sharkey*, 928 F.3d 299, 306–07 (3d Cir. 2019) (holding that immigration detainees are entitled to the "same due process protections" as pretrial detainees). Under the Fifth Amendment's Due Process Clause, "a detainee may not be punished prior to an adjudication of guilt."   *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979).   Thus, "[i]n evaluating whether a pretrial detainee's conditions of confinement violate his substantive due process rights, 'the proper inquiry is whether those conditions amount to punishment of the detainee.'" *Umarbaev v. Lowe*, No. 20-0413, 2020 WL 1814157, at *6 (M.D. Pa. Apr. 9, 2020) (quoting *Bell*, 441 U.S. at 535).   "Under *Bell*, a 'particular measure amounts to punishment when there is a showing of express intent to punish on the part of detention facility officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose.'"   *Bistrian v. Levi*, 696 F.3d 352, 373 (3d Cir. 2012) (quoting *Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007)).   The Court's "inquiry into whether given conditions constitute 'punishment' must therefore consider 'the totality of circumstances within an institution.'"   *Hubbard v. Taylor*, 399 F.3d 150, 160 (3d Cir. 2005) (quoting *Union Cty. Jail Inmates v. DiBuono*, 713 F.2d 984, 996 (3d Cir. 1983)).

Here, the Court finds that there is no express intent to punish, and Petitioner has not alleged as much.   (*See generally* Pet.).   Rather, Petitioner claims "[h]e is living in conditions that make it impossible to follow CDC guidelines," that the facility is "unsanitary," and that continued detention is not "reasonably related to the purpose of immigration detention."   (D.E. No. 37 at 6–

7).   Thus, Petitioner asserts "that the conditions of confinement at the [ECCF] are tantamount to punishment and therefore unconstitutional."   (Pet. ¶ 31; D.E. No. 42 at 4 ("Petitioner asserts herein that the conditions of his confinement are impermissibly punitive given his medical vulnerabilities, Respondent's inadequate measures to combat COVID-19 and that his continued detention given these circumstances cannot be viewed as reasonably related to a legitimate government interest.")).

First, Petitioner ignores the fact that his detention is mandated by Section 1226(c) due to his extensive criminal history.   *See Jennings*, 138 S. Ct. at 846 ("[Section] 1226(c) reinforces the conclusion that aliens detained under its authority are not entitled to be released under any circumstances other than those expressly recognized by the statute.").   Thus, the government has a legitimate interest in detaining immigrants like Petitioner who are subject to removal proceedings to ensure that they will not abscond or endanger the community pending removal proceedings, and to ensure that they appear for those proceedings.   *See, e.g.*, *Jorge V.S.*, 2020 WL 1921936, at *4 (collecting cases).

Second, as the Court has already explained, Petitioner provides no evidence to substantiate his claim that he suffers from a medical ailment that makes him uniquely susceptible to either contracting the virus or experiencing severe complications from the disease.   Further, the record before the Court demonstrates that Petitioner's conclusory assertions regarding the current conditions at ECCF are unsubstantiated.   Indeed, the record shows that as of May 1, 2020, ECCF detainees have unlimited access to soap and water; have access to disinfecting spray upon request; common spaces and equipment are sanitized regularly, and the telephones, tablets, and toilets are cleaned between uses by designated cleaners who are provided with gloves and masks; and cleaning agents are also available in the showers for detainees to clean those areas themselves

-23-

between uses.   (*See, e.g.*, D.E. No. 45-5 ¶ 23; D.E. No. 45-6 ¶ 14).   The record also shows that ECCF has implemented other measures—including maintaining medical staff on-site 24 hours a day, seven days a week; housing detainees depending on their diagnosed medical conditions; using quarantine and cohorting strategies; and taking steps to allow for social distancing—to limit the spread of COVID-19 at the facility and care for those who may be exposed to the virus.   (*See supra* Part I.D.i.).

Accordingly, Petitioner fails to show how, in light of his individual circumstances and the measures ECCF has taken, his conditions of confinement at ECCF are not rationally related to a legitimate non-punitive government purpose or are excessive in light of that purpose.   Therefore, Petitioner's conditions of confinement claim must also be denied.   *See, e.g., Carmen R.*, 2020 WL 2029337, at *11–12 (finding that petitioner failed to substantiate her purported medical conditions and that the facility's "current measures to combat the spread of COVID-19 in relation to this specific [p]etitioner's purported medical conditions . . . are not excessive in relation to the government's legitimate purpose"); *Jorge V.S.*, 2020 WL 1921936, at *4 ("In the absence of a specific and objectively pre-existing serious medical condition which would oblige the jail to take further individualized steps to protect a detainee from the virus, the steps the jail has taken in this matter have more than alleviated any 'deprivation' present in the facilities current conditions.").

## IV.    Conclusion

For the foregoing reasons, Petitioner's Petition is DENIED.   Because the underlying Petition is denied, the accompanying Motion for an order to show cause with temporary restraints is DENIED as moot.   An appropriate order follows.

*s/Esther Salas*
**Esther Salas, U.S.D.J.**
